BEVERLY MATLOCK, Appellee, v. THE INDUSTRIAL COMMISSION *et al.*
(American Airlines, Appellant.)

First District (Industrial Commission Division)  Nos. 1—99—3877WC,
1—99—3898WC cons.

Opinion filed January 25, 2001.—Rehearing denied April 24, 2001.

McCULLOUGH, P.J., concurring in part and dissenting in part.

Michael R. Schneider, of Cohn, Lambert, Ryan & Schneider, Ltd., of Chicago, for Beverly Matlock.

Mark Slavin, of Slavin & Slavin, of Chicago, for American Airlines.

JUSTICE RARICK delivered the opinion of the court:

Claimant, Beverly Matlock, sought benefits pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 1996)) for injuries sustained while in the employ of American Airlines, employer. The arbitrator awarded claimant temporary total disability benefits and medical expenses plus penalties and attorney fees. On review, a majority of the Industrial Commission (Commission) affirmed the

finding of compensability but modified the amount of temporary total disability benefits and reversed the award of penalties and attorney fees. The concurring commissioner would have also affirmed the award of penalties, and the dissenting commissioner would not have found the claim compensable. The circuit court of Cook County confirmed the decision of the Commission. Both claimant and employer appeal. Employer argues the finding that claimant sustained an accident arising out of her employment is against the manifest weight of the evidence. Claimant, in her appeal, contends the denial of penalties and attorney fees is against the manifest weight of the evidence.

At the time of the incident claimant was a flight attendant who had worked for employer some 27 years. On November 22, 1997, claimant was assigned to the business class cabin on American Airlines Flight 66 bound from Chicago to London.

Claimant testified she initially noticed passenger Alva Kathleen Kelly during boarding. Ms. Kelly was noted as being troublesome, and the captain requested the security coordinator to speak with her and assess her "fitness" to travel on Flight 66. The security coordinator found Ms. Kelly to be a bit eccentric but suitable to fly.

After the plane took off from Chicago, Ms. Kelly appeared numerous times in the cabin at the galley where claimant was stationed. She was repeatedly told to return to her seat as she was not supposed to be in that area. Eventually the captain removed Ms. Kelly from the galley and informed her she was to return to her seat and put on her seatbelt. Ms. Kelly told a number of the flight attendants on board that the Federal Bureau of Investigation (FBI) was trying to kill her, that she was being forced to leave the country, and that she had $3 million worth of chemicals in her possession. At one point, Ms. Kelly began making unusual requests including asking for oxygen. When her requests for oxygen were denied, Ms. Kelly began crying and claiming she could not breathe. Eventually one of the flight attendants gave Ms. Kelly an oxygen container to quiet her down but did not turn on the oxygen. Once given the container, Ms. Kelly began flashing a cigarette lighter trying to ignite the oxygen. The lighter and container were then taken away from Ms. Kelly and she was confined to her seat. Shortly thereafter, Ms. Kelly covered herself with a shroud and sprayed a chemical, later determined to be parachlorophenol, on herself. The chemical is used mainly as a topical anesthetic by dentists and can cause nausea, vomiting, pallor, hyperventilation, coma, low blood pressure, pulmonary edema, renal failure, shock and palpitations if absorbed through the skin into the bloodstream. The fumes of the chemical permeated into the galley where claimant was working and she began to feel nauseated and dizzy and experienced heart

palpitations. The flight attendant who was sitting with Ms. Kelly passed out. The captain diverted the plane and landed in Dublin, Ireland. Ms. Kelly was arrested, and claimant and six other flight attendants and passengers were taken to a local hospital for observation. Claimant was released three hours later and was told to rejoin the flight crew. Claimant resumed her regular duties and flew on to London and then worked the flight back to Chicago in order to return home. She testified she could still smell the odor of the chemical on the plane and felt nauseated. Her heart continued to pound hard or irregularly. Claimant further stated she felt anxious and fearful, and on the return flight to Chicago, she felt as though she was not part of the environment of the plane. When the flight landed in Chicago, claimant immediately was debriefed by the FBI and employer. Employer apologized for the trouble on the flight and gave her a pamphlet entitled "Understanding Traumatic Stress Responses: A Handout for Victims and/or Family Members." Claimant requested to see a counselor and was sent to Dr. George O'Shea. Claimant met with Dr. O'Shea three times and was told she should continue counseling. Employer refused to pay for any more sessions with Dr. O'Shea, however. At this point, claimant testified, she felt abandoned by employer.

Approximately five days later, claimant sought treatment from psychologist Dr. Sharon Lieteau. Claimant had previously treated with Dr. Lieteau in 1992 for depression and again in 1995 following the death of her mother and the burning of her brother in a fire. Dr. Lieteau diagnosed claimant with posttraumatic stress disorder stemming from the November 22 flight incident. Claimant complained of recurring nightmares in which the plane actually explodes and she awakes in the midst of a panic attack. Claimant told Dr. Lieteau she felt as though she had narrowly escaped death and lost her ability to feel safe in her normal environment. She also felt a great deal of anger at employer for allowing Ms. Kelly to board the plane and for abandoning claimant after the incident. Dr. Lieteau noted a significant difference in claimant's behavior before and after the incident. Specifically she observed a deterioration in claimant's physical appearance, forgetfulness, and a decreased activity and involvement in her life. At the time of arbitration claimant was still undergoing treatment and had not been released to return to work. Claimant testified she returned to the airport once in January 1998 to pick up a bid sheet to try and return to work. She testified she was very uncomfortable and was afraid that if anyone spoke to her she would faint. She further testified she still experiences anxiety attacks in crowds, has periods of forgetfulness, often becomes disoriented when she attempts to go out

by herself, and has difficulty sleeping. Claimant admitted she has been able to keep up with her part-time studies at Chicago State University.

Employer's expert, Dr. Ronald Ganellen, a clinical psychologist, evaluated claimant in March 1998. He disagreed with the diagnosis of posttraumatic stress disorder and concluded claimant's problems stemmed more from her anger at employer. He did not release her to return to work, however, and found her to still be in need of psychotherapy. He diagnosed claimant as suffering from adjustment disorder with anxiety.

The arbitrator found claimant's claim compensable and further concluded claimant was entitled to penalties and attorney fees because employer's conduct was unreasonable and vexatious. Employer was aware of all the events which took place on Flight 66 and sent her for counseling but did not attempt to obtain a medical evaluation to controvert the findings of the doctors until March 1998. The Commission and the circuit court agreed claimant was entitled to benefits but did not find employer's conduct to be so unreasonable as to justify the imposition of penalties and attorney fees. The circuit court confirmed the decision of the Commission.

■ In Illinois, psychological injuries are compensable under one of two theories, either physical-mental, when the injuries are related to and caused by a physical trauma or injury, or mental-mental, when the injuries are caused by sudden severe emotional shock traceable to a definite time and place and cause even though no physical trauma or injury was sustained. See *City of Springfield v. Industrial Comm'n*, 291 Ill. App. 3d 734, 738, 685 N.E.2d 12, 14 (1997). Recovery for nontraumatically-induced mental disability is limited to those employees who can establish that: (1) the mental disorder arose in a situation of greater dimensions than the day-to-day emotional strain and tension which all employees must experience; (2) the conditions exist in reality, from an objective standpoint; and (3) the employment conditions, when compared with the nonemployment conditions, were the major contributing cause of mental disorder. *Northwest Suburban Special Education Organization v. Industrial Comm'n*, 312 Ill. App. 3d 783, 787, 728 N.E.2d 498, 501 (2000). Mental disorders which develop over time in the normal course of the employment relationship do not constitute compensable injuries. 312 Ill. App. 3d at 788, 728 N.E.2d at 502. On the other hand, in dealing with the physical-mental category, even a minor physical contact or injury may be sufficient to trigger compensability. See *Chicago Park District v. Industrial Comm'n*, 263 Ill. App. 3d 835, 842, 635 N.E.2d 770, 776 (1994). In this instance, the Commission concluded claimant could recover under either theory. We agree. We therefore conclude the Commission's determination is not against the manifest weight of the evidence.

■ While on Flight 66, claimant was exposed to both emotional and physical trauma at the hands of an unruly and, in fact, dangerous passenger. First, Ms. Kelly continually appeared in places she was not supposed to be. She repeatedly made unusual requests and comments. At one point, she requested oxygen and made such a commotion that she was given an oxygen container to keep her quiet. Ms. Kelly attempted to ignite the oxygen, but because of the foresight of one of the other flight attendants who did not turn on the oxygen, was unsuccessful in her efforts. It is true, claimant did not witness this particular incident but she was informed of the problem by several other attendants. Shortly thereafter, claimant was exposed directly to the chemical parachlorophenal sprayed by Ms. Kelly and suffered immediate physical consequences. She became nauseous and dizzy and experienced heart palpitations. Claimant had no idea at that time what the chemical was or its long-term or short-term effects. Clearly claimant suffered a physical trauma while in the course of her employment. Once on the ground, claimant was observed at a hospital and released, but continued to have aftereffects from both the physical and emotional trauma she had experienced. On the rest of the flight to London, she continued to feel nauseous and suffered irregular heartbeats. On the return trip home she felt anxious, afraid and crowded. Claimant sought counseling, but employer refused to pay for further treatment after three sessions even though employer's counselor felt claimant was in need of continued therapy. Added to her anxiety and fear, claimant now felt abandoned and mistreated by employer. Claimant's treating doctor diagnosed claimant as suffering from posttraumatic stress disorder causally related to the traumatic events she experienced in the course of her employment as a flight attendant on American Airlines Flight 66 on November 22, 1997. Clearly claimant's psychological disability arose from a situation of greater dimensions than the day-to-day emotional strain and tension to which all employees, including flight attendants, are subjected in their employment. While flight attendants may be trained to handle and regularly face unruly passengers, they are not subjected normally to ones that attempt to blow up the plane or spray toxic chemicals in a confined cabin. It is reasonable to infer such events in fact would be terrifying to those responsible for keeping order in the cabin. The situation on Flight 66 on November 22, 1997, was not one faced by all employees or even by most flight crews. As a consequence of her experience, claimant has recurring nightmares in which the plane actually explodes and she awakes in the midst of panic attacks. Claimant feared for her life and has lost the ability to feel safe in her normal environment after 27 years of service as a flight attendant. Even

employer's expert could not state with certainty that the events which took place on Flight 66 were not the triggering events for claimant's inability to return to work. Rather, it is reasonable to infer claimant's illness was brought on by the sudden events and emotional shock she experienced on November 22, 1997, while on board Flight 66. Claimant was exposed both to a psychological and physical attack by an unstable passenger while in the course of her employment and should be compensated for her resulting injuries and disability. Any psychiatric counseling in the past notwithstanding, the events of November 22, 1997, clearly were the primary cause of claimant's current disability.

■ Turning to the issue of penalties, generally speaking, an employer's reasonable and good-faith challenge to liability ordinarily will not subject it to penalties under the Act. *Board of Education of the City of Chicago v. Industrial Comm'n*, 93 Ill. 2d 20, 25, 442 N.E.2d 883, 885 (1982); *Complete Vending Services, Inc. v. Industrial Comm'n*, 305 Ill. App. 3d 1047, 1050, 714 N.E.2d 30, 32-33 (1999). For instance, when the employer acts in reliance upon responsible medical opinion or when there are conflicting medical opinions, penalties ordinarily are not imposed. *Avon Products, Inc. v. Industrial Comm'n*, 82 Ill. 2d 297, 302, 412 N.E.2d 468, 470 (1980). Whether an employer's conduct justifies the imposition of penalties is a factual question for the Commission, and the Commission's determination on the matter will not be disturbed on review unless it is against the manifest weight of the evidence. *Board of Education*, 93 Ill. 2d at 25, 442 N.E.2d at 885. In this instance, while the arbitrator concluded penalties were appropriate, the majority of the Commission determined claimant was not entitled to penalties or attorney fees. According to the majority decision, employer had a reasonable basis for disputing the claim because the burden of proof in psychological cases is difficult. It is true the burden of proof in psychological cases is difficult. It is not true, however, that employer had a reasonable basis for disputing the claim in this instance. In fact, employer had no basis for contesting the claim and unreasonably delayed payment of benefits. The evidence presented at arbitration clearly revealed claimant suffered a psychological and physical injury while employed on November 22, 1997. Employer was fully aware of the events that transpired on Flight 66 and acknowledged the traumatic nature of the events when it gave claimant the "Understanding Traumatic Stress Responses" flyer and agreed to send her to a counselor. That counselor, Dr. O'Shea, concluded claimant was still in need of treatment after three sessions, but employer refused to pay for further therapy. In fact employer did not even pay for claimant's hospital stay in Dublin. As noted in *McMahan v. Industrial Comm'n*, 183 Ill. 2d 499, 702 N.E.2d 545 (1998):

"[t]he refusal of an employer to pay for an injured employee's medical expenses is as contrary to the purposes of the Workers' Compensation Act as an employer's refusal to compensate the employee for lost earnings." 183 Ill. 2d at 514, 702 N.E.2d at 552. Claimant's treating doctor, based upon a reasonable degree of medical and psychiatric certainty, diagnosed claimant as suffering from posttraumatic stress disorder causally related to the events that transpired on Flight 66. Employer had no basis to dispute claimant's disability until sending her to Dr. Ganellen in March 1998, some four months after the episode. Even Dr. Ganellen opined claimant was in need of further psychiatric treatment. Still employer refused to pay compensation. Given the totality of the circumstances, employer's conduct was unreasonable. Merely because psychological injury cases are difficult to adjudicate does not mean that the award of penalties and attorney fees is unacceptable or inappropriate. Accordingly, we find the Commission's decision not to award penalties and attorney fees to be against the manifest weight of the evidence and therefore reinstate the arbitrator's award of penalties and fees pursuant to sections 16, 19(k) and 19(l) of the Act.

For the aforementioned reasons, we affirm the judgment of the circuit court confirming the decision of the Commission with respect to the issue of compensability but reverse the decision to deny penalties and attorney fees and further reinstate the decision of the arbitrator granting such fees and penalties.

Affirmed in part; reversed in part.

HOFFMAN, COLWELL and HOLDRIDGE, JJ., concur.

PRESIDING JUSTICE McCULLOUGH, concurring in part and dissenting in part:

I agree with the majority affirming on the basis of a physical-mental trauma. I dissent as to the award of penalties.

The Commission decision suggests two partial concurrence-dissents. Commissioner Kinnaman concurs in granting recovery but would award penalties. Commissioner Gilgis would deny benefits and penalties.

This case does present facts concerning psychological injuries, an area even this court has struggled with in adopting a precedent to be used by arbitrators and the Commission. I agree there was sufficient evidence to find physical-mental basis for recovery. It was a complex case, penalties were properly denied by the Commission, and this court should affirm the order of the circuit court.

Additionally, we now find the facts of this case and its importance

to be such to issue an opinion to provide binding precedent. As the Commission dissent points out, there was "a valid basis to dispute liability in this controversial, hotly-contested 'mental trauma' case." The prior cases and the facts presented here were not so clear as to justify an award of penalties.

I would affirm the award of benefits but deny penalties.